IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


ROBERTA R. THIBODEAUX,           )
                                 )
              Plaintiff,          )
                                 )
       v.                        )        Case No. 04-3554-CV-S-NKL-SSA
                                 )
JO ANNE B. BARNHART,             )
COMMISSIONER OF                  )
SOCIAL SECURITY,                 )
                                 )
              Defendant.          )


ORDER

Pending before the Court is Plaintiff Roberta R. Thibodeaux's ("Thibodeaux")

Motion for Summary Judgment [Doc. # 10]. Thibodeaux seeks judicial review of the

Commissioner's denial of her requests for disability insurance benefits under Title II of

the Act, 42 U.S.C. §§ 401, *et seq.* (Tr. 477-79), and for supplemental security income

(SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

(Tr. 1115-18.) The complete facts and arguments are presented in the parties' briefs and

will be duplicated here only to the extent necessary.[1] Because the Court finds that the

Administrative Law Judge's decision was supported by substantial evidence in the record

as a whole, the Court affirms the ALJ's decision.

---

[1] Upon review of the record and the law, the Court finds the Defendant's position persuasive.
Portions of the Defendant's brief are adopted without quotation designated.

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 1 of 36

# I.    Background

Thibodeaux filed applications for disability benefits under Titles II and XVI on July 29, 2002. (Tr. 476-79.) In her Disability Report, she alleged disability due to poor vision, bad knees, neck problems, psychiatric problems, and schizophrenia. (Tr. 509.) Thibodeaux has filed previous applications for benefits: June 10, 1998, February 1, 1999, January 7, 2000, and August 24, 2000.[2] (Tr. 78-92.) All applications have been denied. (Tr. 39- 69.) On the August 24, 2000, applications, Thibodeaux alleged an onset date of November 30, 1999, and alleged disability due to neck, back, and knee pain, depression and poor vision. (Tr. 42.) On April 25, 2002, another ALJ determined that she was not disabled as defined in the Act. (Tr. 39-51.)

The applications at issue in the present case also allege an onset date of November 30, 1999. (Tr. 477.) The ALJ noted that by alleging an onset date from a previously adjudicated period, Plaintiff was making an implied request to reopen the previous determination. (Tr. 18.) However, the ALJ determined that reopening was not warranted in this instance, and Plaintiff has not objected to that determination. (Tr. 19.) Accordingly, the earliest onset date which could be considered is April 26, 2002, the day after the April 25, 2002, ALJ decision was issued.[3] (Tr. 19.)

_____

[2]It appears that Plaintiff has filed other applications for benefits as well (Tr. 18, 42); however, because those applications were not included in the transcript, they were not listed above.

[3]The ALJ noted an onset date of April 23, 2002, however, the record shows that the previous ALJ
decision was issued on April 25, 2002. (Tr. 51.)

2

## A.    Medical Records[4]

On September 18, 2002, Thibodeaux was voluntarily admitted to Cox Medical with self-inflicted abrasions on her left wrist precipitated by the discovery of her boyfriend with another woman.  She reported that she suffered from chronic neck pain secondary to a cervical fusion the previous year.  Physical examination at admission was unremarkable.  (Tr. 586-589.)  A Psychiatric Evaluation, done at admission, noted that Thibodeaux stated that she had not been depressed or had any particular trouble prior to her admission.  She reported that she had been doing fine.  It was noted that at times in the past, when she had emotional distress due to marriage problems, she had suffered from auditory hallucinations.  (Tr. 590.)  During Mental Status Examination, the physician noted:

> She is pleasant and cooperative.  She is not delusional.  She is polite and friendly.  She denies suicidal or homicidal now and thinks it was an impulsive thing.  She has no plan to harm herself.  She plans to live with her mother and get away from the boyfriend who was unfaithful.  She denies auditory or visual hallucinations.  She is alert and normally oriented.  She has some insight into her problem.  Her judgement is not impaired.  She can think in the abstract and could recall incidents from the recent and remote past without difficulty.  (Tr. 591.)

She was diagnosed with an adjustment disorder with mixed emotional features and a suicidal gesture.  (Tr. 591.)  She was assessed as having a GAF[5] of 40 on admission.  (Tr.

---

[4]Thibodeaux's brief cites records included in the transcript going back to the late 1990s.  As the date of onset must be after the last determination of non-disability, only treatment occurring on or after April 26, 2002, is recited in this Order.

[5]Global Assessment of Functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.

592.)  A Psychiatric Discharge Summary, dated September 20, 2002, documents that

Thibodeaux was not prescribed any psychotropic drugs, but was given a small amount of

Trazadone to help her sleep.

On October 1, 2002, Thibodeaux underwent a Psychological Consultative

Examination by David Lutz, Ph.D.  Thibodeaux reported that she was not taking any

medications.  She reported pain in her neck and back.  She reported that she got up

around 10:00 in the morning and watched television.  She stated that her mother cooked

the meals and indicated that she had a poor appetite.  She stated that she spent much of

the day sitting on the front porch unless she was fishing.  She indicated that she did some

household chores, such as mopping, but that this aggravated her back pain.  She stated

that her mother did the shopping.  She reported that she had trouble sleeping and

sometimes went 2-3 days without sleep.  (Tr. 606.)

During a Mental Status Examination, the psychologist noted that Thibodeaux was

dressed appropriately and her hygiene was adequate.  She was responsive and

cooperative.  She exhibited a limited but appropriate range of affect, as she smiled a

couple of times.  She seemed to have some insight into her condition, but little sense of

what she could do to overcome it.  She suggested that what she had tried had not worked,

but it was not clear how much she had done on a consistent basis.  Dr. Lutz noted that

"[s]ome of her statements were slightly dramatic."  She seemed able to understand and

respond to normal conversation.  Her thoughts were logical and consistent.  She did not

evidence any significant distressed affect, or unusual or bizarre behavior.  Thibodeaux

denied having had delusions, ideas of reference, compulsions, or obsessions. She was oriented to time, person, and place. Her long term memory was consistent with her general intellectual functioning, which Dr. Lutz estimated to be in the borderline range.

On the WAIS-III test, Thibodeaux scored in the borderline range on her Verbal IQ, Performance IQ, Full Scale IQ, and Verbal Comprehension. She was in the low average range in her Perceptual Organization and average in her Working memory. (Tr. 607-608.)

The psychologist diagnosed:

> AXIS I: Dysthymic disorder, mild to moderate, late onset. She described depressive symptoms over the past ten years
> AXIS II: Borderline, dependent, and histrionic characteristics. Borderline intellectual functioning - Full Scale IQ of 74
> AXIS III: Neck and back pain
> AXIS IV: Physical problems, unemployment, limited education
> AXIS V: GAF = 60 (Current) Mild to moderate symptoms

He also wrote that

> Thibodeaux seemed able to understand and remember simple and moderately complex instructions, but would have difficulty with complex instructions. She seemed able to sustain concentration and persistence on simple and moderately complex tasks, but would have difficulty with complex tasks. She seemed able to interact in moderately demanding social situations. She seemed able to adapt to her environment. (Tr. 609.)

Another psychologist, Geoffrey W. Sutton, Ph.D., evaluated Thibodeaux on or about October 17, 2002. He opined that she had mild limitation in her restriction of activities of daily living and moderate restriction in maintaining social functioning and in maintaining concentration, persistence, and pace. He also opined that she was "not significantly limited" in her ability to: remember locations and worklike procedures;

5

understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation. (Tr. 627-28.)

Thibodeaux was treated by Floyd Simpson, D.O., from December 23, 2002 to April 23, 2003. On December 23, 2002, Dr. Simpson diagnosed her with Major Depression with psychotic features, but found her global assessment of functioning[6] at 65. (Tr. 638.) She was prescribed Lexapro and Seroquel. (Tr. 637-638.) On January 23, 2003, the Seroquel and Lexapro were increased and Wellbutrin was added in response to her complaint that her depression had worsened. (Tr. 636.) On February 24, 2003, the

_____

[6] A GAF of 61 through 70 is characterized by mild symptoms or some difficulty in social or occupational functioning, but generally functioning pretty well, and having some meaningful interpersonal relationships. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS TEXT REVISION 32-34 (4th ed. 1994) (DSM-IV-TR).

Seroquel was replaced with Cogenth after Thibodeaux reported that Seroquel caused nightmares. (Tr. 635.) On March 26, 2003, Thibodeaux continued to report symptoms of depression. Zyprexa was discontinued and replaced with Restoril. (Tr. 634.) On April 23, 2003, Thibodeaux was instructed to take the Seroquel with the Restoril after she reported that she did not think the Restoril was working. (Tr. 633.) Dr. Simpson wrote in an undated letter:

> Be ever mindful that these records reflect an individual that is seriously stricken with a chronic mental illness. Affirmative comments should not be misconstrued to minimize the seriousness of the illness.
>
> These Progress Notes are not intended to defend the need for Disability or the confirmation of Disability. Instead the patient records are intended to reflect the progress of the course of treatment for a very serious and most likely life long illness. (Tr. 632.)

In a Medical Source Statement-Mental dated January 5, 2004–nine months after he last observed her–Dr. Simpson opined that Thibodeaux was moderately limited in her ability to:

> – understand and remember detailed instructions
> – carry out detailed instructions.
> – maintain attention and concentration for extended periods.
> – perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.
> – work in coordination with or proximity to others without being distracted by them.
> – complete a normal workday and work week without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.
> – accept instructions and respond appropriately to criticism from supervisors.
> – respond appropriately to changes in the work setting.

(Tr. 640-641.)  Dr. Simpson also stated that Plaintiff had "no significant limitation" in her ability to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 641-42.)

The transcript includes Medical Records from Family Medical Center, from October 9, 2002, to January 2, 2004.  On October 9, 2002, Thibodeaux presented with a complaint of pain in her neck, back, and right knee.  She was diagnosed with knee, neck, and back pain and was prescribed Lorcet Plus.  (Tr. 684-685.)  On November 7, 2002, she again complained of right knee pain and neck pain.  Physical therapy was ordered, as well as a consultation for the knee.  (Tr. 679-680.)  On December 11, 2002, Thibodeaux presented to Dr. Pettey for evaluation of her right knee pain.  Physical examination of the knee noted some atrophy of the right distal quadricep and tenderness.  The physician diagnosed "probable symptomatic osteoarthritis vs. a symptomatic degenerative lateral meniscus tear" (Tr. 678) and recommended an injection of Lidocaine (Tr. 678).

On January 17, 2003, Thibodeaux reported continuing neck pain and depression. Physical examination was unremarkable. The physician noted that an x-ray report in the chart showed "degenerative changes between the odontoid of C2 and the anterior arch of C1. There is some spurring at C3-4 and C4-5." (Tr. 671.) An MRI of the cervical spine was ordered and she was prescribed Norco and Nortriptyline. (Tr. 673.) On February 21, 2003, Thibodeaux was given a prescription for Paxil, Norco, and Diclofenac Sodium. (Tr. 670.) On July 18, 2003, she continued to report back and neck pain, status post cervical fusion. She additionally reported having migraine headaches. Thibodeaux reported that she had been out of her medications for a while. She was given scripts for Norco, Paxil, and Diclofenac Sodium. (Tr. 666-67.) On August 19, 2003, Thibodeaux was diagnosed with depression, anxiety, chest pain, and knee pain. The Paxil was increased and she was started on Klonopin. She was continued on Norco and Diclofenac. She was additionally given a referral to physical therapy. (Tr. 660-62.)

On September 19, 2003, Ms. Thibodeaux reported that her chronic neck pain was controlled with the Diclofenac and occasional Norco. She stated that the anxiety was better on Klonopin. (Tr. 655.) She was prescribed Paxil, Zoloft, and Prevacid. (Tr. 656.) Thibodeaux presented on September 24, 2003, after having been in an auto accident several days earlier. She complained of pain in her neck and back and also her left arm. Examination revealed that her neck was tender, but she had a full range of motion of the left arm with "moderate" pain, there was no swelling, she was alert and oriented, her behavior was appropriate, deep tendon reflexes were equal and symmetric, strength and

9

sensation were "normal," and her cranial nerves were intact. (Tr. 653.) She was prescribed Percocet and Zanaflex. (Tr. 653-54). On October 24, 2003, Thibodeaux reported that her pain from the accident was better, although she requested more pain medications. She was prescribed Percocet and Norco. (Tr. 651-52.) On November 19, 2003, Thibodeaux reported that her headaches were relieved with hydrocodone, but that she was taking 3-4 daily. She reported that she was going to physical therapy for her neck. She stated that her depression had been worse since changing to Zoloft. She had stopped taking Zanaflex, which had not been helpful. She still reported crying spells and poor sleep. She was diagnosed with headache, neck pain, depression, anxiety, and GERD. She was prescribed Wellbutrin, Biaxin, Amoxil, and Omeprazole. (Tr. 648-59.)

On January 2, 2004, Thibodeaux rated her neck pain at an 8/10 and that it seemed to be getting worse in spite of seeing a chiropractor. She also reported pain in her right knee. She stated that she was taking about 4 hydrocodone daily and the Wellbutrin. An MRI of the neck was ordered, she was referred to orthopedics for the knee, and Wellbutrin was increased. (Tr. 646-47.)

The Transcript includes Medical Records from Doctor's Hospital of Springfield. On February 12, 2003, Thibodeaux was diagnosed with back strain and prescribed Flexeril and Ultram. (Tr. 1054-155.) On March 22, 2003, three weeks after right knee surgery, she presented to the Emergency Room with a complaint of right knee pain and swelling. She was given an ACE wrap and prescribed Daypro for pain and swelling. (Tr. 1049-53.) On August 22, 2003, Thibodeaux was diagnosed with a probable rotator cuff

tear after she presented to the Emergency Room with right shoulder pain. She was prescribed Voltaren and Ultram. (Tr. 1033-37.) On December 22, 2003, Thibodeaux presented to the Emergency Room with a complaint of right knee pain. She stated that she had been told that she needed bilateral knee replacement surgery. She related that the pain increased with activity. An x-ray showed an abnormal appearance of the distal right femur and an MRI was recommended. She was prescribed Medrol Dosepak and Vicodin. A referral was made to Dr. Huff. (Tr. 1022-26.)

The Transcript includes Medical Records from Robert Hufft, M.D., dated December 11, 2002 to January 27, 2004. On January 17, 2003, Thibodeaux reported that an injection she had received in her knee in December had not been helpful, and she continued to complain of pain and swelling. An MRI was ordered. (Tr. 1097.) On January 31, 2003, the physician noted that there was some abnormality in the MRI, but assessed that this was osteoarthritis that was mildly symptomatic. He prescribed Celebrex. (Tr. 1096.)

On February 13, 2003, Thibodeaux phoned the office to report that the Celebrex had not helped. She was subsequently scheduled for debridement of the right knee. (Tr. 1096.) Surgery was performed on March 3, 2003. (Tr. 1095.) On March 13, 2003, Dr. Hufft noted that Plaintiff was doing "fairly well." (Tr. 1094.) She was instructed on a self-rehabilitation program. (Tr. 1094.) On April 17, 2003, it was noted that Plaintiff had still not started therapy. (Tr. 1094.) Numerous attempts were made to contact Plaintiff to no avail. (Tr. 1094.) On April 29, 2003, examination revealed "some" puffiness, but no

11

effusion, the wounds had healed "nicely," she walked with only a "slight" right limp, her knee was stable, and the patella tracked well. (Tr. 1094.) A third prescription for physical and physiotherapy was given. (Tr. 1094.) On January 27, 2004, Dr. Hufft noted that Plaintiff was only taking an antidepressant medication. (Tr. 1093.) Examination revealed that she walked with a "slight" right limp which appeared to be exaggerated. (Tr. 1093.) She had no effusion in either knee, there was "a little bit" of swelling over the anterior aspect of the right quadricep, but her right knee was stable. (Tr. 1093.) Range of motion testing also revealed that she had full extension in both knees. (Tr. 1093.) The physician made the following assessment:

> She has some mild arthritis in her right knee that does not need any ongoing active or aggressive treatment. She should be able to function quite well with the right knee. I suggest she use therapeutic doses of ibuprofen. I would not put any restrictions on her activity level. Braces and splints are not indicated. Shots are not indicated . . . .

(Tr. 1093.)

In a Medical Source Statement dated February 5, 2004, Dr. Angela Whitesell, opined that Thibodeaux retained the physical capacity to:

> – Frequently lift and/or carry 5 pounds
> – Occasionally lift and/or carry 10 pounds
> – Stand and/or walk a total of 2 hours in an 8-hour workday
> – Sit a total of 6 hours in an 8-hour workday
> – Push and/or pull on an unlimited basis
> – Occasionally climb, stoop, crouch, or bend
> – Never balance or kneel
> – Frequently reach, handle, finger, and feel

Whitesell also opined that rest would be helpful every 1-2 hours for 10 minutes. (Tr. 1090.)

## B. Hearing Testimony

Thibodeaux testified at an oral hearing before the Honorable Linda Carter, Administrative Law Judge, in Springfield, Missouri, on January 28, 2004. Appearances were also made at that hearing by Thibodeaux's attorney, Dennis O'Dell, and by Terri Crawford, a vocational expert. (Tr. 1143.)

Thibodeaux testified that she was born on March 24, 1954, had completed the 10th grade, had not obtained her GED, but had trained and been certified as a nurse assistant. She testified that she was able to read and write without difficulty, that she wore bifocal glasses but needed a new prescription. Thibodeaux testified that she was able to drive but did not own a car. She testified that she did not use public transportation but depended on someone to take her to her appointments.

Thibodeaux testified that she had tried to work at Winn-Dixie in the deli in November or December of 1999, but was unable to sustain this employment because she had to be on her feet too much without the opportunity to sit down. She testified that it hurt to sit too long or to stand too long. Thibodeaux testified that she had worked at Winn Dixie prior to her accident in July of 1999; that she had returned to work about one month after her accident; and that she had then realized that something was very wrong with her neck. She testified that she would have blackout spells. Thibodeaux testified that she had been on Wellbutrin since 2004, but had been on the hydrocodone for about a year.

Thibodeaux testified that her primary physician was Dr. Whitesell; her orthopedic physician was Dr. Hufft; and her psychiatrist had been Dr. Simpson. She testified that Dr. Whitesell had referred her to Burrell Behavioral Health and that she was waiting for an appointment. Thibodeaux testified that she was able to stand 15-30 minutes; sit 15-30 minutes; walk a quarter of a block; and lift 5-10 pounds.

Thibodeaux testified that when she was depressed, she did not like to be around people and that she cried a lot. She testified that depression interfered with her sleep, causing her to be up and down at night. She testified that she slept most of the day. She testified that sometimes her medication helped her sleep and that sometimes it didn't. Thibodeaux testified that depression affected her energy, motivation, and concentration. She testified that she had twice acted out thoughts of suicide, the first time in Louisiana and the second in 2003. She testified that she had been hospitalized at Cox North for the second attempt.

Thibodeaux testified that she spent three-quarters of the day lying down or reclining off and on. She testified that her activities on an average day included: "Usually when I get up I take a shower and I'll go and I'll sit down and I'll watch a little TV. And then I'll get up approximately about a half-an-hour to an hour, try and do some clean up. I have to clean up one room at a time because I be slow at it. I try to do dishes, try to clean up the house most of the day and then the rest of the time I sit down and I watch TV or listen to the radio." (Tr. 1163.)

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 14 of 36

Thibodeaux testified that she lived with a friend and that her only income was Medicaid and food stamps. She occasionally went grocery shopping, but sometimes had trouble going through the store. Thibodeaux testified that sometimes her medication relieved the neck pain and sometimes it did not. She testified that Dr. Hufft had told her that the arthritis was so bad in her knees that she would have to have knee replacements around the time she was 50. She testified that she had undergone arthroscopy on both knees. She testified that she did not use a cane or crutch, but did use ACE wraps, which she applied herself when the pain was excruciating and the knee was swollen. She testified that her knees would swell by mid-afternoon if she had to stand a lot; that the pain was excruciating and she would begin to limp.

Thibodeaux testified that she had undergone carpal tunnel surgery on her hands, but that they still bothered her. She testified that she did not use any splints or wraps on her hands, and that additional surgery had not been recommended. She had recently had an MRI of the neck, ordered by Dr. Whitesell, but had not yet received the results. Thibodeaux testified that she continued to have symptoms in spite of the increase in her Wellbutrin in January.

Terri Crawford next testified as a vocational expert regarding Thibodeaux's past relevant work as a fast food worker, light work, unskilled labor, performed at the medium exertional level; sales clerk, light work, semi-skilled labor, performed at the light exertional level; and deli cutter/slicer, light work, unskilled labor, performed at the light exertional level. Answering the ALJ's hypothetical question assuming Thibodeaux could

15

perform light work, the vocational expert testified that there were jobs as a checker–about 700,000 jobs in the U.S. and 16,000 in Missouri; or as a cleaner, housekeeper–about 3 million in the U.S. and 21,000 in Missouri. Assuming Thibodeaux could do only sedentary work, the Vocational Expert testified that there would be some assembly work, as a hand packager–about 65,000 jobs in the U.S. and 1,500 in Missouri; or as an assembler–about 142,000 jobs in the U.S. and 4,000 in Missouri.

### C. ALJ's Decision

The ALJ found that Thibodeaux was 50 years old, had a tenth grade education, and had past relevant work experience as a fast food worker, sales, clerk, and deli cutter. She found Thibodeaux to have been diagnosed with the following impairments: degenerative disc disease, chronic neck pain status-post cervical spine fusion, migraine headaches, bilateral knee degenerative joint disease-post arthroscopic surgery, history of carpal tunnel syndrome with bilateral repairs, borderline intellectual functioning, affective disorder, and history of adjustment disorder. While the ALJ considered these impairments to be "severe," she found that they did not meet or equal any of the listings set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ considered the "A" criteria of the Listings and found that the Thibodeaux had an affective disorder under Listing 12.04; however, after analyzing the "B" and "C" criteria, the ALJ found that claimant's mental impairments did not qualify for presumptive disability based on the degree of functional limitation associated with the mental impairment. Specifically, she found that Thibodeaux had only "mild" restrictions

16

as to the activities of everyday life; "mild" difficulties in maintaining social functioning;

"moderate" difficulties in maintaining concentration, persistence, and pace; and no

episodes of decompensation. The ALJ also found Thibodeaux could understand and

remember simple instructions and maintain persistence and concentration on simple tasks;

moreover, she did not live in a highly supportive living arrangement, and no mental

health professional had ever indicated the need for such a facility.

The ALJ found that Thibodeaux's self-reported activities of daily living were

inconsistent with her allegations of totally debilitating symptomatology. Thibodeaux told

Dr. Lutz that she watches television; is able to cook and shop, although her mother does

most cooking and shopping; sits on the porch; fishes; does some household chores; and

reads books. She reported in the Claimant Questionnaire that she occasionally prepares

and cooks simple meals; grocery shops; washes dishes; watches television and listens to

the radio; and has a driver's license and drives her mother. The ALJ noted that

Thibodeaux's "lack of activities of daily living might be by choice, rather than the result

of disabling impairment." Further,

> [t]he record includes evidence strongly suggesting that the claimant has
> exaggerated symptoms and limitations, and the claimant's responses while
> testifying were evasive or vague at times, and left the impression that the
> claimant may have been less than entirely candid. The claimant testified
> she must rest/recline ¾ of the day (six hours in an eight-hour workday); yet,
> there is no such restriction by any physician. In fact, Dr. Whitesell only
> recommended resting for 10 minutes every one to two hours, which could
> be accommodated in a normal break schedule. The claimant reported in the
> Claimant Questionnaire that she was unable to follow written directions;
> yet, the record indicates she was able to fill out all required Social Security
> forms without any assistance.

Ultimately, the ALJ found that Thibodeaux had the residual functional capacity to perform the exertional demands of light work, or work that requires maximum lifting of twenty pounds and frequent lifting of ten pounds; no significant unprotected heights, potentially dangerous unguarded moving machinery, or commercial driving; wear knee braces and wrist splints as required; and perform simple, repetitive, low stress work, with no minimal public contact and no customer service. Thibodeaux was unable to perform her past relevant work as fast food worker, sales, clerk, or deli cutter. She did not have any acquired work skills that were transferable to the skilled or semiskilled work functions of other work. Based on an exertional capacity for light work and the claimant's age, education, and work experience, Thibodeaux was not disabled.

## II. Discussion

### A. Statement of the Issues

Thibodeaux raises six arguments for reversing the ALJ's decision; however, these arguments overlap and can be reduced to four essential issues: (1) Whether the ALJ properly determined Thibodeaux's mental impairments were not of listing level severity; (2) Whether the ALJ performed a proper credibility determination; (3) Whether the ALJ properly considered the medical opinions of record; and (4) Whether the ALJ posed a proper hypothetical question to the vocational expert.

### B. Standard of Review

The standard of appellate review of the Commissioner's decision is limited to a

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 18 of 36

determination of whether the decision is supported by substantial evidence on the record as a whole. *See Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *See Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence in the record supports the Commissioner's decision, the court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because the court would have decided the case differently. *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001). If, after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations omitted). The Eighth Circuit has noted that "[w]e defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

**C.      Analysis**

**1.      The ALJ Properly Determined Plaintiff's Mental Impairments Were Not of Listing Level Severity**

At step three of the sequential evaluation process, the ALJ properly determined that Thibodeaux did not meet or equal the criteria of any listed impairment set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 20-27.) Thibodeaux argues that, even assuming the evidence of her mental impairments were not sufficient to meet the requirements of

19

Listing 12.04, the ALJ erred in finding that her mental impairments did not equal the criteria for Listing 12.04. Pl.'s Br. at 74-76.

The Supreme Court held, in *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990), that the severity standards for listed impairments are high:

> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." *See* 20 C.F.R. § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity") . . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.

*Sullivan*, 493 U.S. at 532. *See also Caviness v. Apfel*, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998) ("Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively.").

Section 12.04 of the Medical Listings is outlined in the regulations:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance, or
> d. Psychomotor agitation or retardation; or

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 20 of 36

e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking;

. . . .

AND

B. Resulting in at least two of the following:
1. Marked[7] restrictions of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation,[8] each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

---

[7] "Marked" means more than moderate but less than extreme.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.C (2005).  A "marked" limitation may arise when several activities or functions are impaired, or when only one is impaired, as long as the degree of limitation is such as to interfere seriously with one's ability to function independently, appropriately, effectively, and on a sustained basis.  *See id.*

[8] Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.C(4)(2005).  Such episodes are inferred from medical records showing significant alteration in medication or documentation of the need for a more structured psychological support system (e.g. hospitalization, halfway house, or a highly structured and directed household).  *See id.*  Repeated episodes of decompensation, each of extended duration, refers to three episodes in one year, each lasting for at least two weeks.  *See id.*

21

20 C.F.R. Part 404, Subpart P, App. 1, § 12.04 (2005).

As stated above, Thibodeaux argues that her mental impairments are equivalent to the criteria in Listing 12.04. Pl.'s Br. at 75. To medically equal a listed impairment, the medical findings must at least equal in severity and duration those required by the listed impairment. *See* 20 C.F.R. § 404.1526(a)(2005). Medical equivalence must be based on medical findings and supported by medically acceptable clinical and laboratory diagnostic techniques. *See id. See also* SSR 86-8 ("In no case are symptoms alone a sufficient basis for establishing the presence of a physical or mental impairment."). Additionally, "'[f]or a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *See Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)). The absence of medical findings similar and equal in severity to the criteria in a listing is "fatal" to a claim of medical equivalency. *See id.* at 1353.

Thibodeaux relies on the medical source statement completed by Dr. Simpson. Pl.'s Br. at 75. In that statement, Dr. Simpson indicated that Thibodeaux was "moderately" limited in her ability to perform numerous work related functions. (Tr. 640-41.) The ALJ did not place great weight on these restrictions, noting that the treatment notes of Dr. Simpson did not support these findings. (Tr. 30.) Additionally, the statement was not completed until February 5, 2004, nearly one year after Dr. Simpson

22

had last seen her.  (Tr. 633, 640-41.)  The records show that Dr. Simpson saw Thibodeaux

on five occasions during the period from December 23, 2002, through April 23, 2003.

(Tr. 30, 633-38.)  His treatment notes show that on December 23, 2002, she was friendly,

pleasant, and talkative; she provided her history in a symmetrical, linear, and goal

directed manner; and she was appropriately dressed, and well mannered.  (Tr. 638).  He

assessed her GAF at 65, indicating only "mild" symptoms.  (Tr. 638.)  His notes from the

next three sessions do not contain any objective evidence, and focus only on difficulties

she was having getting over an ex-boyfriend.  (Tr. 634-36.)  On April 23, 2003, Dr.

Simpson noted that Thibodeaux had reportedly gotten over her ex-boyfriend, and that she

was talkative and seemed "up."  (Tr. 633.)  These findings contradict the limitations

found in the Medical Source Statement–Mental.  The ALJ's decision not to place great

weight upon such findings is supported by substantial evidence in the record.  *See*

*Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) ("[T]he ALJ need not give

controlling weight to a physician's RFC assessment that is inconsistent with other

substantial evidence in the record."); *see also Woolf v. Shalala*, 3 F.3d 1210 (8th Cir.

1993) (ALJ was justified in discrediting the opinion of a treating physician when it was

based solely on the claimant's subjective complaints and was not supported by his other

findings).

    Thibodeaux also points to the discharge summary prepared by Dr. Babin on

September 20, 2002, which assessed her GAF at 40.  (Tr. 534; Pl.'s Br. at 75.)  However,

this was an isolated incident.  On September 18, 2002, Thibodeaux was admitted to the

23

hospital for attempting to harm herself after having caught her husband with another woman. (Tr. 586.) Examination revealed that she had caused superficial abrasions to her left wrist. (Tr. 589.) She repeatedly denied having any intent to actually commit suicide. (Tr. 584, 586, 588.) She stated that she was not depressed or having any particular trouble prior to this incident (Tr. 590), and examination revealed that she was pleasant and cooperative, non-delusional, and had no symptoms of psychosis (Tr. 584). She was alert, oriented, answered questions appropriately, made "good" eye contact, and had an "appropriate" mood. (Tr. 588.) Her mental status was clear. (Tr. 584.) She had not sought mental health treatment for over a year prior to this incident (Tr. 1002), and she sought no treatment after the incident until December 2002, when, as stated above, Dr. Simpson found her to be friendly, pleasant, and talkative, and assessed her GAF at 65. (Tr. 638.)

Thibodeaux argues in the alternative, that if her mental impairments did not equal Listing 12.04, the ALJ erred by failing to properly consider whether her "constellation of impairments" was equivalent to a listing. Pl.'s Br. at 75. However, she does not identify any particular listing, and makes no further argument as to why she equaled any other listing. She does not point to any specific evidence to support a finding that her impairments caused the specific findings required by a listing. As the Supreme Court stated, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530, 110 S. Ct. 891 (emphasis in original); *see also Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995)(quoting

*Zebley*).  The Supreme Court recognized similarly strict requirements for a claimant to show that she equaled a listing.  *See Zebley*, 493 U.S. at 531, 110 S. Ct. at 891 (to prove he has an impairment equivalent to a listed impairment, claimant must "present medical findings equal in severity to all the criteria" for the most similar listing).  Thibodeaux has not pointed to any evidence which would support a finding that her impairments equal any listed impairment.  Additionally, a review of the decision shows that the ALJ thoroughly considered all of her impairments during her step three analysis.  (Tr. 20-27.) The ALJ's findings that Thibodeaux did not have an impairment or combination of impairments that met or equaled any Medical Listing at 20 C.F.R. Part 404, Subpart P, App. 1, of the Commissioner's regulations are supported by substantial evidence.

## 2.    The ALJ Properly Assessed Plaintiff's Credibility

In concluding that Thibodeaux's testimony was not fully credible (Tr. 30), the ALJ's consideration of the subjective aspects of her complaints comported with the Commissioner's regulations at 20 C.F.R. §§ 404.1529, 416.929 (2005), and the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984) (subsequent history omitted).  The Eighth Circuit has noted that when the ALJ refers to the *Polaski* considerations and cites inconsistencies in the record, she may properly find a claimant not credible.  *See Lowe v. Apfel* 226 F.3d 969, 972 (8th Cir. 2000); *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000).

The Eighth Circuit has also held that "where adequately explained and supported, credibility findings are for the ALJ to make."  *Lowe,* 226 F.3d at 972 (citing *Tang v.*

25

*Apfel*, 205 F.3d 1084, 1087 (8th Cir. 2000)). The ALJ is not required to "discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints." *Lowe*, 226 F.3d at 972 (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)). *See also McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000).

The ALJ considered Thibodeaux's self-reported activities of daily living and found they were inconsistent with allegations of totally debilitating symptomatology. (Tr. 28.) "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." *Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001)(citing *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987)). Thibodeaux told Dr. Lutz that she was able to cook and shop, although her mother did most of it for her, she performed some household chores, spent much of the afternoon and evening sitting on the porch, went fishing, and read mystery novels. (Tr. 28, 605-06.) In the Claimant Questionnaire, she reported that she occasionally prepared and cooked simple meals, went grocery shopping, watched television and listened to the radio, had a driver's license, and drove her mother during the day. (Tr. 28, 528-30.) She reported on two occasions that she walked for exercise. (Tr. 668, 671.) The ALJ indicated that the reported activities were fairly limited (Tr. 28), but noted that two factors weighed against considering this strong evidence in support of finding Thibodeaux disabled (Tr. 28). She noted that the reported daily activities could not be objectively verified with any reasonable degree of certainty, and that the alleged degree of limitation was not supported by the medical evidence and other factors

26

discussed in her decision. (Tr. 28.) Overall, the ALJ determined that Thibodeaux's reported daily activities were outweighed by the other evidence. (Tr. 28.)

The ALJ noted that evidence in the record strongly suggested that Thibodeaux exaggerated symptoms and limitations, that her responses while testifying were evasive or vague at times, and left the impression that she was less than entirely candid. (Tr. 28). For example, she testified that she had to lie down for three-fourths of the day. (Tr. 28, 1162.) However, this statement is not supported by any evidence in the record, and there is no evidence in the record that she even reported the need to lie down during the day to medical personnel. The statement is also inconsistent with her reported activities of daily living, as she stated that she spent her afternoons and evenings sitting on the porch or fishing. (Tr. 606.) The only physician who opined that she would need to lie down and rest during the day was Dr. Whitesell, who opined that Thibodeaux needed only ten minutes of rest every one to two hours. (Tr. 28, 1090.)

Thibodeaux reported in the claimant questionnaire that she had trouble following written directions, however, the ALJ noted she was able to fill out all required forms without any assistance. (Tr. 28.) She testified that she could only sit for 15 to 30 minutes at a time, yet, as noted above, she stated she spent the majority of the afternoon and evening sitting on the porch. (Tr. 606.)

In her disability report, Thibodeaux alleged disability due to schizophrenia. (Tr. 509.) However, the record contains no evidence regarding an impairment of schizophrenia. The medical evidence showed several other exaggerations as well. On

January 25, 2001, Thibodeaux reported that her neck hurt so badly it was difficult to lift

her head off the pillow; however, examination revealed that she was in no acute distress,

she was interviewed sitting in a chair with "total self support of the neck," and while

lying on the examination table she was able to hold her neck up without help.  (Tr. 382.)

On October 1, 2002, Dr. Lutz noted that some of Plaintiff's statements were dramatic; and

that although she claimed to have to wash her hands five times per hour to prevent

becoming "shaky and nervous," she had come straight from her car into the office without

stopping in the waiting room, and did not evidence any difficulties.  (Tr. 607.)  Finally,

Dr. Hufft noted on January 27, 2004, that Plaintiff was walking with a slight limp "which

appeared to be exaggerated."  (Tr. 1093.)  An ALJ may properly consider a claimant's

exaggeration of her symptoms in evaluating her subjective complaints.  *See Jones v.*

*Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997); *Jenkins v. Bowen*, 861 F.2d 1083, 1086

(8th Cir. 1988).  *See also Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)

("We have been careful to explain that an ALJ may disbelieve a claimant's subjective

reports of pain because of inherent inconsistencies or other circumstances.").

Thibodeaux testified that her medications caused drowsiness.  (Tr. 29.)  However,

the ALJ did not find this allegation to be credible as the medical records failed to indicate

any complaints of this nature to her physicians.  (Tr. 29.)  The ALJ also noted that the

record did not show frequent changes of medications due to alleged side effects.  (Tr. 29.)

The ALJ properly considered the lack of evidence to support this allegation.  *See Zeiler v.*

*Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) ("She did not complain to her doctors that

her pain medication made concentration difficult."); *Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. 2003) ("We also think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention Mr. Depover having side effects from any medication.").

Plaintiff argues that the ALJ erred by failing to consider her prescription pain medication. Pl.'s Br. at 78. The record does show that Thibodeaux took prescription pain medication. (Tr. 662, 667, 673, 685.) However, she did not take it regularly. In the claimant questionnaire dated September 5, 2002, she reported that she had not been taking any medications for over a year (Tr. 527), and on July 18, 2003, she reported that she had been out of her medications for "a while" (Tr. 666). The record also shows that when she was taking her medications, they were effective in controlling her pain. (Tr. 655, 666.) Impairments that are controllable or amenable to treatment do not support a finding of disability. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997).

The ALJ considered that the clinical and objective findings were inconsistent with allegations of debilitating pain. (Tr. 29.) An ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence, but a lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (citing *Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000)). She noted that the record was devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or

29

motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, which was an indication that Thibodeaux continued to move about on a fairly regular basis.  (Tr. 29.)  The ALJ also noted that there was no diagnostic evidence to substantiate Thibodeaux's complaints of debilitating pain.  (Tr. 29.)

The objective medical evidence regarding her complaints of neck pain showed that Thibodeaux underwent a discectomy and cervical fusion of C4-5 on March 13, 2001.  (Tr. 385.)  On June 5, 2002, examination revealed her neck was non-tender, range of motion was painless, and x-rays of the cervical spine were unremarkable.  (Tr. 563-66.)  Later that month her neck was noted to be supple, flexion was "normal," and shoulder shrug was "normal."  (Tr. 588-89.)  In October 2002, range of motion was noted to be limited (Tr. 1080), but x-rays showed no significant findings (Tr. 679).  Examinations of the neck in January 2003 through March 2003, showed no tenderness, painless and normal range of motion, and normal muscle strength and tone.  (Tr. 1049, 1054, 1076.)  In September 2003, Thibodeaux was in a car accident, and examination showed her neck to be tender. (Tr. 653.)  Diagnostic testing showed some degenerative changes, but no fracture or subluxation.  (Tr. 698-99.)

Objective evidence with regard to Thibodeaux's complaints of back pain on June 5, 2002, show her back was non-tender and her gait was "normal."  (Tr. 564).  On September 18, 2002, her gait was again noted to be "normal."  (Tr. 589.)  On October 9, 2002, examination revealed back tenderness and a decreased range of motion.  (Tr. 684.) X-rays showed "marginal" spurring along the spine, but there was no evidence of

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 30 of 36

fracture, subluxation, or dislocation. (Tr. 581-82.) Dr. Turner noted that these findings were not significant. (Tr. 679.) In January 2003, examination revealed no tenderness. (Tr. 1077.) In February 2003, her range of motion was limited (Tr. 1054), but in March 2003, examination revealed normal strength, tone, and range of motion (Tr. 1049). In September 2003, x-rays of the thoracic spine showed only "mild" degenerative changes. (Tr. 698.)

With regard to complaints of right knee pain, x-rays on June 5, 2002, showed "mild" degenerative changes, but she had a full range of motion. (Tr. 566.) Her gait was noted to be "normal." (Tr. 566.) On September 18, 2002, her gait was again noted to be "normal." (Tr. 589.) In October 2002 and November 2002, x-rays showed narrowing of the retropatellar joint and some spurring behind the patella. (Tr. 581-82, 679.) In December 2002, examination revealed tenderness, "some" atrophy of the right distal quadricep, limited range of motion, and a "mildly" antalgic gait, but there was no significant effusion, erythema, or warmth, and the knee was stable. (Tr. 678.) In January 2003, an MRI scan revealed "mildly" symptomatic osteoarthritis (Tr. 1096), and in March 2003, Plaintiff underwent arthroscopic surgery (Tr. 1071). In April 2003, she walked with a "slight" right limp and there was "some" puffiness, but no effusion, the wounds had healed "nicely," the knee was stable, and the patella tracked well. (Tr. 1094.) In December 2003, examination revealed some swelling, but range of motion was "normal," and x-rays showed "no apparent arthritic change or bony abnormality, and the joint space was well maintained." (Tr. 1025.) In January 2004, examination revealed a "slight" right

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 31 of 36

limp which "appear[ed] to be exaggerated," and there was "a little swelling," but no effusion and the knee was stable. (Tr. 1093.) Flexion of the right knee was somewhat limited, but she had full extension. (Tr. 1093.) X-rays showed some "early marginal osteophytes" suggestive of early degenerative disease, but the joint space was well preserved. (Tr. 1093.) The objective medical evidence did not support Thibodeaux's allegations of disabling pain.

Thibodeaux argues that the ALJ erred by using "scripted discussions" in her credibility analysis. Pl.'s Br. at 86-88. However, Thibodeaux cites no authority to support her argument that using some of the same language in her decisions is impermissible. A review of the hearing transcript as well as the hearing decision shows that the ALJ evaluated all of the evidence of record in making her determination. Simply because some of the language mirrors that of another hearing decision does not indicate that particular facts of this case were not thoroughly reviewed.

Because the ALJ articulated the inconsistencies upon which she relied in discrediting Thibodeaux's testimony regarding her subjective complaints, and because her credibility findings are supported by substantial evidence on the record as a whole, the ALJ's credibility findings are affirmed. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996).

### 3. The ALJ Properly Considered the Medical Opinions of Record

In her decision, the ALJ thoroughly considered the opinions of all treating sources. (Tr. 30-31.) Thibodeaux argues that the ALJ erred by giving controlling weight to the

Case 6:04-cv-03554-NKL    Document 12    Filed 11/15/05    Page 32 of 36

opinion of Dr. Hufft over the opinions of Drs. Simpson and Whitesell because his opinion related only to her knee impairment. Pl.'s Br. at 71-74. However, it is clear from Dr. Hufft's opinion that he was referring only to limitations with regard to Thibodeaux's right knee. (Tr. 1093.) Dr. Hufft stated that Plaintiff should be able to function "quite well" with the right knee, and that no activity restrictions were warranted. (Tr. 1093.) He additionally suggested only ibuprofen for relief of any discomfort. (Tr. 1093.) A treating physician's opinion should be granted controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000)(citing *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). There is no basis, other than speculation, that the ALJ relied only on Dr. Hufft's medical records and did not consider both the medical records and opinions of Drs. Simpson and Whitesell.

Thibodeaux argues that the ALJ should have given controlling weight to the opinion of her treating physician, Angela Whitesell, M.D. Pl.'s Br. at 51-67. Although the opinions of a treating physician are generally entitled to substantial weight, *see Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir. 1986)), such an opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Trossauer v. Chater*, 121 F.3d 341, 343 (8th Cir. 1997). An ALJ is also justified in discrediting the opinion of a physician when it is based solely on the claimant's subjective complaints and was not supported by his other findings. *See*

33

*Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993). The ALJ considered Dr. Whitesell's opinion, as well as her treatment notes and the objective evidence of record, and found that the limitations in her medical source statement were not supported by the medical evidence and appeared to be derived from Thibodeaux's subjective complaints. (Tr. 30.)

Thibodeaux also argues that controlling weight should have been given to Dr. Simpson's Mental Medical Source Statement. Pl.'s Br. at 51-67. As discussed above, the ALJ may properly discredit the opinion of a treating physician if it is not supported by the medical evidence of record. *See Kelley*, 133 F.3d at 589; *Trossauer*, 121 F.3d at 343. The ALJ considered Dr. Simpson's medical source statement, but found that it also was not supported by his treatment notes and was based on Thibodeaux's subjective complaints. (Tr. 30.) The records show that Dr. Simpson saw her on five occasions during the period from December 23, 2002, through April 23, 2003. (Tr. 30, 633-38.) On February 5, 2004, nearly ten months after he had last seen her, Dr. Simpson completed the medical source statement on which he opined that Thibodeaux was "moderately" limited in her ability to perform numerous work related functions. (Tr. 640-41.) However, his treatment notes show that on December 23, 2002, Thibodeaux was friendly, pleasant, and talkative, she provided her history in a symmetrical, linear, and goal directed manner, she was appropriately dressed, and well mannered. (Tr. 638.) He assessed her GAF at 65, indicating only "mild" symptoms. (Tr. 638.) His notes from the next three sessions did not contain any objective evidence, and focused only on difficulties she was having getting over an ex-boyfriend. (Tr. 634-36.) At the last session on April 23, 2003, Dr.

34

Simpson noted that Thibodeaux had reportedly gotten over her ex-boyfriend, and that she was talkative and seemed "up." (Tr. 633.) The ALJ properly discredited Dr. Simpson's opinion.

Finally, Thibodeaux argues that the ALJ erred by giving too much weight to the opinions of agency doctors. Pl.'s Br. at 67-71. However, the ALJ is required to consider their findings. *See* 20 C.F.R. §§ 404.1527(f)(2)(I), 416.927(f)(2)(i)(2005). The ALJ did not accord controlling weight to these opinions; rather, she considered them as one factor among many. The ALJ properly considered these opinions.

### 4.    The ALJ Posed a Proper Hypothetical Question to the Vocational Expert

Thibodeaux argues that the ALJ posed an erroneous hypothetical question to the vocational expert because she did not include the need to rest for 10 minutes every 1 to 2 hours, as well as other limitations contained in the medical source statements of Drs. Whitesell and Simpson. Pl.'s Br. at 61-62. However, as discussed above, the ALJ properly discredited both statements. Therefore, the hypothetical question posed by the ALJ to the vocational expert properly included only those impairments and restrictions that the ALJ found to be credible. *See Montgomery v. Chater*, 69 F.3d 273, 275 (8th Cir. 1995); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994). Because the hypothetical question included those impairments the ALJ found credible and excluded those she discredited for legally sufficient reasons, the vocational expert's testimony that Thibodeaux could perform work existing in substantial numbers was substantial evidence

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 35 of 36

in support of the ALJ's determination.  *See Miller v. Shalala*, 8 F.3d 611, 613-14 (8th Cir.

1993).

**III.    Conclusion**

A review of the record as a whole of the ALJ's decision reveals that it is supported

by substantial evidence.  Accordingly, it is hereby

ORDERED that Thibodeaux's Motion for Summary Judgment [Doc. # 10] is

DENIED.  The decision of the Commissioner is AFFIRMED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge


Dated:  November 15, 2005
Jefferson City, Missouri

Case 6:04-cv-03554-NKL   Document 12   Filed 11/15/05   Page 36 of 36